# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00499-CR

**Aaron Ledesma Veloz, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
### NO. 05-675-K26, HONORABLE C. W. DUNCAN JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Aaron Ledesma Veloz appeals from a conviction by a jury of two counts of indecency with a child. *See* Tex. Penal Code Ann. § 21.11 (West 2003). In three issues, appellant challenges the legal sufficiency of the evidence to support his conviction on one of the two counts, the failure of the trial court to give a requested jury instruction, and the accuracy and ethics of an interpreter employed by the State who translated appellant's non-custodial interview. For the reasons that follow, we affirm the judgment of conviction.

## BACKGROUND

In March 2005, appellant's wife, Elsa Samora Veloz, was employed by the complainant's family to do household chores. Mrs. Veloz had worked for the family for ten years; her mother had worked for the family prior to that time. Appellant occasionally worked for the family as well. Appellant and his wife had a one-year-old child, and Mrs. Veloz was three months

pregnant with their second child. The complainant's family considered the Velozes part of their extended family.

The evidence at trial showed that on March 17, 2005, the complainant's family was on vacation in Colorado and had left the thirteen-year-old complainant, S.W., behind because she was in a play. She was left in the care of a neighbor and Mrs. Veloz. On the evening of March 17, S.W. was playing with a friend at the neighbor's home. At Mrs. Veloz's request, appellant picked up S.W. to give her a ride home.

S.W. testified that on the drive home, which took only a few minutes, appellant asked her if she wanted to sit in front of him in the driver's seat and help drive the car. She agreed to do so. S.W. testified that as she sat in appellant's lap and placed her hands on the steering wheel, "one of his hands was, I guess, on his side, like on his leg, and the other one was pressing against my vagina." She demonstrated for the jury how appellant's hand pressed against her vagina on the outside of her clothes and that he moved his hand around. He removed his hand when they arrived at the gate to S.W.'s home. S.W. estimated that the touching occurred for "maybe 20 or 30 seconds" and that it was not accidental, but done on purpose. S.W. testified that when they arrived at her house, she stayed outside for a few minutes to play with her dogs and then entered the house.

When S.W. went inside, Mrs. Veloz was doing chores. Appellant picked up his infant son and went upstairs. S.W. testified that she called her mother to tell her about the incident in the car and then went upstairs to play on the computer. She testified that, as she sat in front of the computer, appellant came up behind her, pulled her backward toward him, and tickled her. S.W.

2

testified that appellant then put his hand underneath her shirt and touched her on her chest with his arm. She testified that he "touched me inappropriately."

Mrs. Veloz testified that, after S.W. had been upstairs a few minutes, she went upstairs. Mrs. Veloz was sufficiently alarmed at what she observed to have a discussion with her husband and to touch his penis to determine whether it was enlarged. S.W. then returned downstairs and again called her mother who arranged for S.W. to be picked up by the neighbor.

After an investigation and interviews of appellant and Mrs. Veloz, appellant was arrested and indicted on two counts of engaging in sexual contact with a child by touching S.W.'s genitals and breasts. In count one, he was charged with touching S.W.'s genitals through her clothing with intent to arouse or gratify his sexual desire. In count two, he was charged with touching S.W.'s breasts with intent to arouse or gratify his sexual desire. Appellant testified at trial, denying that he touched S.W. except by accident and testifying that part of his interview given at the station house was mistranslated by the Spanish interpreter. The jury found him guilty on both counts. This appeal followed.

## DISCUSSION

### *Legal sufficiency*

In his first issue, appellant challenges the legal sufficiency of the evidence to support a conviction for the offense of indecency with a child by contact in count two because the evidence was lacking and the State failed to prove that any contact was done with the requisite intent to arouse or gratify sexual desire. He urges that there are no facts from which one can infer appellant's intent to engage in sexual contact because, if he touched her, it was on her chest and not her breasts.

3

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Rollerson v. State,* ___ S.W.3d ___, 2007 Tex. Crim. App. LEXIS 862, at **10-11 (Tex. Crim. App. June 27, 2007); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony.

With respect to count two, the State was required to prove beyond a reasonable doubt that appellant, with intent to arouse or gratify his own sexual desire, intentionally and knowingly engaged in sexual contact with S.W., a child younger than seventeen years and not appellant's spouse, by touching S.W.'s breast. *See* Tex. Penal Code Ann. § 21.11(a). The testimony of a child victim alone is sufficient to support a conviction for a sexual offense. Tex. Code Crim. Proc. Ann. art. 38.07 (West 2005); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).

In a legal sufficiency review, the jury's inference of intent is afforded more deference than the evidence supporting proof of conduct. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Circumstantial evidence of a defendant's guilty knowledge is not "required to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements." *Id*. (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)); *see also Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

Appellant testified at trial. He testified through an interpreter that, at his wife's request, he agreed to pick S.W. up from the neighbor's house. Although he admitted allowing S.W.

to sit in his lap in the driver's seat of the vehicle, he denied touching her on the genitals in the car or her breasts in the upstairs room. Except for these denials, appellant's and S.W.'s accounts were similar. Through an interpreter, appellant testified that if he touched her, "I barely touched her with my elbow her chest. At no time did I touch her intentionally on her breast." Appellant also testified that he thought S.W. was upset with Mrs. Veloz for coming upstairs and interrupting them.

S.W. testified that appellant put his hand underneath her shirt and touched her on her chest. Relying on *Nelson v. State*, 505 S.W.2d 551, 552 (Tex. Crim. App. 1974), appellant thus urges that her testimony was an insufficient basis for a conclusion by the jury that he touched her breast, a more specific area of the body than the chest. But *Nelson* is not dispositive here. Unlike in *Nelson*, S.W.'s testimony that appellant touched her chest was not the only proof of the offense set forth in count two.

With regard to the count two evidence, S.W. testified:

Q:    Did anything unusual start happening at that point?

A:    I was at the computer and he got behind me in a chair and started pulling me back towards him.

       * * *

Q:    How did he do that?

A:    He was just sitting, pulled me by my chair towards him.

Q:    Did he say anything to you when this was going on?

A:    No.

Q:    Were you still able to reach the computer while this was happening?

5

A: Not really. Kind of, though.

Q: So what were you doing?

A: I would just pull myself back toward the computer again and then he would do it again, he pulled me towards him.

Q: How many times did that happen where you would pull away and he would pull you back towards him?

A: Two or three times.

Q: Did anything else happen?

A: No.

Q: At some point in time did Mr. Veloz touch you any other way?

A: Yes.

Q: Tell us how that happened.

A: Well, first he danced with me a little bit and then I went back to the computer and played a little more. And he got behind me in his chair and he started tickling me over my clothes first, like my hips and under my arms.

Q: What happened next?

A: Then he went under my shirt and he like put his hand toward my neck and pulled it back down.

Q: When he did that did he touch your breast?

A: He went like under like with his arm but he didn't touch them with his hand.

Q: We talked about this prior to your testimony here today, correct? Now, when you think of touching you think of touching with your hand, correct?

A: Yes.

Q: Did he touch you with any part of his body on your breast?

6

A:    Maybe his arm.

Q:    And when he reached up inside your shirt, what part of his body did he touch inside your shirt?

A:    His arm touched me, like my chest.

Q:    Okay. I don't want to embarrass you, S., but I need to ask this question. Were you wearing any kind of bra or underclothing at that point in time?

A:    No.

Q:    Did you really need to at that point in time?

A:    Not really.

Q:    Thinking back on it now, did any part of his arm or his hand make any kind of contact with your breasts, any part of your breasts?

A:    I don't really remember. But I don't remember it making contact, no.

Q:    When you—what happened next?

A:    Well, before that he danced with me.

Q:    Okay.

A:    It was just like I'd been in ballet at that time, I didn't do ballet then, it was before that. So I wanted him to lift me up in his arms. So I like wanted him to lift me up in his arms. And then he would carry me around on his hips and [the baby] was just on the floor, just crawling around, and then we danced for a little bit and then he sat me down on the counter and I got off and that's when I got on the computer.

Q:    After the dancing, was that when he started tickling you?

A:    Yes.

Q:    All that happened that we just talked about?

A:    Yes.

7

The prosecutor then asked S.W. to demonstrate what happened to the jury. S.W. showed the jury how appellant tickled her and, on top of her clothes, where he touched her when he reached up her shirt. S.W. testified that, after the second incident, she called her mother again because she was uncomfortable that appellant had touched her inappropriately. S.W. was picked up by her neighbor to wait at the neighbor's house for her uncle to come get her. In response to further questioning, S.W. testified that, in addition to telling her mother and father about the touchings, she told her psychologist, Dr. Lisa Cashin, under whose care she had been for a year prior to the incident for treatment for obsessive compulsive disorder.

On cross-examination, S.W. testified that after coming into the house from playing with her dogs, she ran upstairs. She showed appellant how she danced in her dance group and "I told him I was going to jump into his arms. I kind of motioned to him." Appellant then carried her around. The following testimony then occurred:

Q: And you testified earlier that he may have touched you on the breast with his arm; is that correct?

A: Yes.

Q: While going up to your neck; is that right?

A: Yes.

Q: Okay. That you say it was under the clothing rather than over the clothes; is that correct?

A: Yes.

S.W. acknowledged that she did not report the incidents to Mrs. Veloz.

S.W.'s testimony does not stand alone. Dr. Cashin testified that S.W. told her, during a counseling session, that appellant touched her breast while S.W. and appellant were upstairs at her residence on the evening in question. She testified that S.W. told her that:

> when she was on the computer and that Mr. Veloz was in a chair behind her and that he kept pulling her toward him. That he started tickling her, first it was over her clothes, I think on her hips and just in her chest area. And then he put his hands underneath her shirt, and the way she described it was that his arms—his arms, she said it was with one arm that he brushed up against her skin as he went up her shirt and touched her breasts as he went up and she said she didn't have anything on underneath.

In addition to the testimony of S.W. and Dr. Cashin, the State introduced into evidence the videotape of appellant's non-custodial statement showing that appellant admitted he brushed against S.W.'s breast while tickling her. In his testimony, appellant denied that he intentionally touched her breasts. In his direct testimony, appellant testified:

Q:     Is it possible that you could have accidentally touched her breasts?

A:     Maybe, but I don't think I ever touched her. At no time I touched her. Maybe accidentally, but I barely did—I barely touched her with my elbow her chest. At no time did I touch her intentionally on her breast.

Appellant's intent to arouse or gratify his sexual desire when he touched S.W.'s breasts was established by evidence showing that Mrs. Veloz observed that he was having a physical response to his encounter with S.W. and then confronted him. Whether the couple argued or had a discussion, or whether she observed his "part was altered" or his penis was erect or enlarged—all based on conflicting and translated testimony—it is clear Mrs. Veloz touched appellant and felt his

9

genital area because she was alerted to a change in his physical appearance. S.W.'s testimony describing the touching by appellant was also sufficient to show his intent to arouse or gratify his sexual desire. *See* Tex. Code Crim. Proc. Ann. art. 38.07; *Tear*, 74 S.W.3d at 560.

It was the jury's function to resolve any conflicts in the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). The jury is in the best position to evaluate the credibility of the witnesses and the evidence, and we must afford due deference to its determination. *Id*. The jury was free to accept or reject any and all of the evidence presented by either side. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

Viewed under the appropriate standard, we conclude that the evidence is legally sufficient to support appellant's conviction under count two for indecency with a child. *See Lane v. State*, 151 S.W.3d 188, 191-92 (Tex. Crim. App. 2004). We overrule appellant's first issue.

***Requested jury charge***

In his second issue, appellant contends that the trial court erred in overruling his requested jury instruction on accidental touching. Specifically, appellant contends that evidence was presented that any touching by appellant was accidental and there was no intent to arouse or gratify his sexual desire. He therefore requested the following instruction, which was denied by the court:

> You are instructed that if you find from the evidence that defendant accidentally touched or brushed against the sexual part of the said [S.W.], with no intent to arouse or gratify anyone's sexual desire, or if you have a reasonable doubt thereof, you will acquit the defendant.

10

In the application paragraph of the charge relating to count two, the jury was instructed as follows:

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that [appellant], on or about March 17, 2005, in Williamson County, Texas, engaged in sexual contact with a child younger than 17 years of age and not [appellant]'s spouse, namely, any touching by [appellant], including touching through clothing, of any part of the breast of [S.W.], with intent to arouse or gratify [appellant]'s sexual desire, then you will find [appellant] guilty of the offense of Indecency with a Child by Contact, as alleged in count one [sic] of the indictment, and so say by your verdict.

But if you do not so believe, or if you have a reasonable doubt thereof, you will acquit [appellant] and say by your verdict "Not Guilty."

A defensive instruction such as the one requested by appellant is not required when the issue in question is not a statutorily enumerated defense and merely serves to negate elements of the State's case. *See Ortiz v. State*, 93 S.W.3d 79, 92 (Tex. Crim. App. 2002) (no instruction required when suicide defense theory to crime of capital murder simply negates elements of State's case); *Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001) (no instruction required for defense of "independent impulse" as it simply negates conspiracy liability element of State's case); *Giesberg v. State*, 984 S.W.2d 245, 248-51 (Tex. Crim. App. 1998) (no instruction required for defense of alibi). Because appellant's requested instruction merely served to negate elements of the State's case, we conclude the trial court did not err in denying the instruction. *See Ortiz*, 93 S.W.3d at 92. We overrule appellant's second issue.

***Biased or erroneous translation***

In his third issue, appellant complains that the interpreter employed by the district attorney's office to translate appellant's Spanish words during the station house interview was

11

inaccurate and biased. He contends that, because the translator, Irene Odom, was employed by the State, she had an inherent conflict of interest and, in misinterpreting appellant's words, she was "literally able to put words in the defendant's mouth." Appellant did not object at trial to the testimony of the translator or on the theory he now raises on appeal. Instead, appellant contends that the mistranslation and the conflict of interest were so egregious as to be fundamental error not requiring a contemporaneous objection at trial. Appellant's concerns are therefore twofold: (i) Odom's employment by the district attorney's office constituted a conflict of interest and an ethical violation of her role as a licensed court interpreter, and (ii) she made errors in her translation.

Ms. Odom, a victim-witness coordinator and licensed court interpreter employed by the Williamson County District Attorney's Office, testified that she was present during a non-custodial interview of appellant by law enforcement on April 8, 2005, at the Williamson County Sheriff's Office. Odom testified that she is a licensed interpreter certified to translate Spanish to English and English to Spanish. The record does not reflect that a transcript was prepared of the interview. Rather, as portions of the interview were in Spanish and portions in English, Odom testified to certain statements appellant made during the course of the interview.[1] Odom testified that, during the interview, appellant admitted that he picked S.W. up from her friend's house on the evening of March 17, that S.W. was sitting on his lap during the ride home, and that, while tickling S.W. at her residence that evening, his arm brushed against her breast. Odom also testified that

---

[1] The entire videotape of the interview was admitted into evidence over defense counsel's objection that appellant's statement was hearsay and not admissible because appellant was available and would testify. The court overruled this objection because the exhibit was a non-custodial statement of the defendant admissible as an admission by a party opponent. *See* Tex. R. Evid. 801(e)(2). On cross-examination, defense counsel did not challenge Odom's qualifications or translations and asked only three questions.

appellant admitted during the interview that his penis was erect when his wife came upstairs while he was playing with S.W. Odom testified that appellant stated that any sexual urge he had was for his wife, that she came upstairs and observed he was having a physical response, that she was disturbed, and that they argued.

Odom testified that appellant admitted during the interview that his "private part" was "erected" immediately after his contact with S.W. During his testimony at trial, appellant denied that he told the police that he had an erection. He testified that he stated, in Spanish, that his "part" was "altered," and that Odom had misinterpreted his statement as an admission that his penis was erect. Appellant testified that the expression "my part was altered" did not have reference to his "private part," but that the translator misinterpreted it that way. He explained that he used the term to mean that he was "tired" or "upset." Appellant denied that he had ever used words to mean an erection.

During the State's rebuttal, the State played excerpts of the videotape. Odom was specifically asked whether she had accurately interpreted appellant's Spanish words contained on the videotape:

> Q: Ms. Odom, there was some discussion yesterday that you may perhaps have improperly interpreted some of the defendant's statement. Did you and I spend some time last night going over the defendant's statement in detail?
>
> A: Yes, sir.

As the State played four excerpts of the videotape interview for the jury, the prosecutor questioned Odom about each excerpt:

13

Q:      Okay. Ms. Odom, in discussing this clip, while it's hard to understand, there's some discussion at the beginning of the clip about him having some urges towards his wife, correct?

A:      That's correct.

Q:      In the context of those—that conversation what kind of urges are we talking about there?

A:      Sexual urges.

Q:      And in—later on in the discussion he comments about his wife seeing—seeing what?

A:      His—he calls it his part.

Q:      His part?

A:      Correct.

Q:      And in the context of the conversation, what are we talking about there?

A:      His penis.

Q:      What word does he describe that you interpreted as erected on the—in the English—what Spanish word does he use?

A:      (Spanish spoken.)

Q:      Literally translated if we were to take that word out of context, what would—how would you translate that literally?

A:      Altered.

Q:      But in the context of this conversation—well, let me ask you this:  Is it important when you are translating from English to Spanish or Spanish to English do the words always translate literally?

A:      No.

Q:      In order to be accurate in your translation do you have to take these words in context?

14

A:     I do, yes.

Q:     Do you believe that's the more accurate interpretation when you look at the context?

A:     Yes, I do.

Q:     Okay.  So you interpret (Spanish spoken) to mean what in this segment?

A:     Erect.

Q:     And do you believe based on the context of conversation that's a correct interpretation?

A:     I believe so.

At the close of direct examination, the State offered into evidence an exhibit containing the excerpts about which Odom testified.  The trial court sustained appellant's objection to the videotape excerpts.  On cross-examination, defense counsel asked six questions, and Odom testified that any sexual urges appellant admitted to were directed toward his spouse and that he consistently denied that he had "any kind of sexual contact with the child."  On redirect examination, the following testimony occurred:

Q:     When did he admit on the videotape that he had the erection?

A:     When his wife went upstairs and saw them.

Defense counsel did not object and did not ask any further questions.

On cross-examination, appellant admitted that he had told the detectives that he had an erection because he was thinking about his wife and the possibility of having sexual relations with

15

her. Appellant acknowledged that he and his wife had not had sexual relations for months because she was pregnant.

Appellant did not object to Odom's testimony on the basis that she was biased or unqualified or that she erroneously translated appellant's interview. It is undisputed that appellant did not preserve any error regarding the translation of the videotape for appellate review and, unless it constitutes fundamental error or a "waivable right" that he did not waive, we may not consider the issue. *See Mendez v. State*, 138 S.W.3d 334, 341-42 (Tex. Crim. App. 2004); *Marin v. State*, 851 S.W.2d 275, 280 (Tex. Crim. App. 1993), *overruled in part on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997). Appellant cites no case or statutory authority for this argument, but contends that this is an issue of first impression. It is not.[2]

Appellant had ample opportunity to challenge the experience and qualifications of the interpreter as well as to contest the substance of the translation. Appellant was entitled to produce a translated transcript of the videotape or his own version of the disputed portions. Both sides were entitled to put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version. The present case is not one in which the defendant was unable to arrange for contemporaneous verification of a translation or in which he was deprived of

---

[2] *See, e.g.*, *Fonseca v. State*, 163 S.W.3d 98, 100-01 (Tex. App.—Fort Worth 2005, pet. ref'd) (right to court-appointed interpreter at guilty plea is waivable right); *Guerrero v. State*, 143 S.W.3d 283, 284 (Tex. App.—Waco 2004, no pet.) (defense counsel appointed as interpreter). This case is unlike *Garcia v. State*, 149 S.W.3d 135, 142-43 (Tex. Crim. App. 2004), in which the defendant did not speak English and was deprived of a translation of trial proceedings. Appellant was served by court-appointed interpreters at trial.

16

translation services at trial.  *See, e.g.*, *Garcia v. State*, 149 S.W.3d 135, 142-43 (Tex. Crim. App. 2004).  It is only the videotaped interview that is at issue here.

If Odom erred on the translated nuances of "part," "private part," "enlarged," or "erect[ed]" in the interview, appellant not only had an opportunity to verify the accuracy of the translation, but to cross-examine the translator, and to provide his own evidence regarding the meaning of the words.  The role of interpreter is less akin to that of a judicial officer than it is to that of a witness, and an interpreter is subject to the same challenges and scrutiny as a witness.  *See* 6 John Henry Wigmore, *Evidence* § 1824 (Chadbourn rev. 1976) ("an *interpreter . . .* is a kind of witness"); *cf.* Tex. R. Evid. 604 (analogizing interpreters and expert witnesses for purposes of determining whether interpreter is qualified).  Accordingly, we conclude that the opportunity to conduct voir dire of the interpreter, thereby exposing the potential biases and the demeanor of the interpreter, coupled with the opportunity for cross-examination as occurred here, afforded appellant ample protection.  The credibility of a witness remains a question for the trier of fact.

Appellant argues that the State violated the Code of Ethics and Professional Responsibility for Licensed Court Interpreters by permitting one of its employees to attend an interrogation and translate a defendant's words, "thereby literally putting words in the defendant's mouth in order to convict him."  Citing 16 Tex. Admin. Code § 80.100(a) and (e) (2005), appellant contends that Odom violated Canon 3 of the code of ethics obligating her to be impartial and avoid conflicts of interest and to refrain from conduct that may give an appearance of bias.  Section 80.100(a) states:

17

The degree of trust that is placed in court interpreters and the magnitude of their responsibility necessitate high, uniform ethical standards that will both guide and protect court interpreters in the course of their duties as well as uphold the standards of the profession as a whole. Interpreters are highly skilled professionals who fulfill an essential role in the administration of justice.

16 Tex. Admin. Code § 80.100(a). Canon 3 states: "Interpreters shall be impartial and unbiased and shall refrain from conduct that may give an appearance of bias." *Id*. § 80.100(e)

By its terms, Chapter 80 of the administrative code, promulgated under the authority of Chapter 57 of the Texas Government Code,[3] only applies to licensed court interpreters who use or deliver interpreting services "to the judiciary." *Id*. § 80.100(b). When Odom translated appellant's statements during the interview, and then testified at trial, she was not "deliver[ing] interpreting services to the judiciary" within the meaning of section 80.100(b). Thus, appellant's reliance on section 80.100 is misplaced.

Certainly, steps should be taken to ensure adequate and accurate translations. That Odom was a licensed interpreter would seem to ensure that the district attorney's office sought to obtain competent translation services. That Odom was employed by the district attorney's office does not render the translations erroneous or unethical. Odom was available for cross-examination for defense counsel to pinpoint errors in translation. Odom was not disqualified from assisting law enforcement during the investigation or from testifying as a witness at trial; she was not an interpreter for the court.

---

[3] *See* 16 Tex. Admin. Code § 80.1 (2005). Chapter 57 speaks to court interpreters who "interpret court proceedings." Tex. Gov't Code Ann. § 57.001(5) (West 2005). It allows for the appointment of a certified or licensed court interpreter "if a motion for the appointment of an interpreter is filed by a party or requested by a witness in a civil or criminal proceeding in the court" or on the court's own motion. *Id*.

We conclude that error, if any, was harmless. Although the reason for appellant's physical response was disputed—he insisted he had "sexual urges" for his wife—the *telling* evidence was Mrs. Veloz's testimony that she was sufficiently alerted to appellant's conduct that she touched his penis to determine whether he was having a physical response to something. In his interview, appellant stated that his wife misunderstood what she saw.[4] Thus, even if the trial court erred in allowing the contested word to be translated as "erected," there was other evidence showing appellant had a specific sexual response following his contact with S.W. In these circumstances, appellant was given the opportunity to challenge the State's translation and present alternative translations. The error, if any, did not affect appellant's substantial rights. We overrule appellant's third issue.

## CONCLUSION

Having overruled appellant's issues, we affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: July 11, 2007

Do not publish

_____

[4] This Court has reviewed the entire videotaped interview exhibit.

19